**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BRUSE OGILVIE,                        :        CIVIL ACTION

                              :

               Plaintiff,       :

         v.                       :

                              :

NORTHERN VALLEY EMS, INC.    :        NO. 07-485

                              :

             Defendant.     :

**MEMORANDUM RE: SUMMARY JUDGMENT**

Baylson, J.                                           **October 29, 2008**

Presently before this Court is Defendant's Motion for Summary Judgment in an action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. and the Pennsylvania Human Relations Act (PHRA).  Plaintiff Bruse Ogilvie has alleged sexual harassment and retaliation by his employer, Defendant Northern Valley EMS.  For the following reasons, the motion will be GRANTED.

## I.    Factual Background

Mr. Ogilvie was hired as a paramedic by Northern Valley EMS ("NOVA") in February 1999.  (Def.'s Statement Undisputed Material Facts ¶ 81.)  He was the Director of Operations from 2001 until January 2004 and then resumed as a full-time paramedic until he was terminated in January 2005.  (Id. ¶¶ 83, 98-99.)

    A.    Staging Incident

The incident which Defendant contends warranted Ogilvie's termination is called a "staging dispatch," which took place on January 8, 2005, during Ogilvie's 6:00 p.m. to 6:00 a.m. shift.  A staging dispatch is a command received from the 911 Center that relocates an EMS

vehicle to a different location to assist another company's service area.  At 5:30 a.m., the station received a phone call requesting a staging dispatch because of an accident on the highway.  (Id. ¶¶ 5-8.)  Mr. Ogilvie's co-worker, Mr. Regan, answered the call and advised the 911 Center that they would head to the Blue Mountain Gap, a location between Carbon and Lehigh Counties. Subsequently, Regan received a call from Joseph Chandler, another NOVA employee at Palmerton Hospital, who suggested the hospital as a staging location.  (Id. ¶¶ 9-10.)  Ogilvie contends Chandler did not have authority to make this second staging dispatch.  Ogilvie decided not to go to either staging location and to monitor the situation from the NOVA base.  He did not notify the 911 Center of this decision.  (Id. ¶¶ 11-13.)

Ogilvie argues that the crew was not required to stage to either location (Id. ¶ 16); however, the NOVA Human Resources (H.R.) chair stated that such a staging dispatch is "not a request" and that the crew should go if available.  (Dep. Wendy Abruzzi 16.)  Both parties agree that the crew was required to notify the 911 Center of changes in their status and location, including intent not to stage.  (Def.'s Statement Undisputed Material Facts ¶¶ 17, 19.)  Failure to communicate with the 911 Center was a violation of Department of Health regulations and the Pennsylvania Code, which paramedics must follow.  (Id. ¶ 20.)  Ogilvie admits that he as well as Regan were responsible for communications with the 911 Center and that he or Regan should have contacted the 911 Center to inform the Center that they planned to stay at the station.  (Id. ¶¶ 22-23.)

The crew that came on at 6:00 a.m. to relieve Plaintiff's crew responded to an emergency dispatch that came in at 5:57 a.m. and originated from the highway accident necessitating the staging dispatch.  (Id. ¶¶ 30-31.)  NOVA believes that Regan and Ogilvie's failure to stage

resulted in a delay in responding to the emergency dispatch. (Id. ¶ 32.) Both employees were suspended for the incident and placed under investigation. (Id. ¶ 39.) After meetings with the H.R. Committee and an appeal hearing, both employees were terminated by letters dated January 19, after an appeal hearing on January 17. (Id. ¶ 155, Def.'s Trial Ex. 17, 18.)

Ogilvie and Regan applied for unemployment compensation following their termination, and NOVA opposed both applications. (Def.'s Statement Undisputed Material Fact ¶ 179.) NOVA appealed Ogilvie's application because it alleges Ogilvie materially misrepresented his termination in his application. (Def.'s Answer ¶ 23.) Ogilvie stated he was terminated for reporting the 401(k) problem described below; NOVA responded that Ogilvie was terminated for the staging incident. (Id.)

NOVA had disciplined Ogilvie several times prior to the staging incident. Ogilvie received two warnings in December 2003 and was placed on a three-month probation because of a patient care issue in November 2004. (Def.'s Statement Undisputed Material Facts ¶¶ 61, 63-64.)[1] He also had received suspensions for failing to send assistance to a call and failing to complete patient reports on time. (Id. ¶¶ 41, 46.) Plaintiff alleges that he was harassed by this quality assurance review. (Id. ¶¶ 69-70.)

B.    401(k) Complaints

Prior to his termination, Ogilvie was concerned that NOVA employees did not receive 2004 third- and fourth-quarter statements regarding their 401(k) accounts. He as well as other

_____

[1]Plaintiff disputes the propriety of these disciplinary actions, but they are not at issue in this case.

employees complained about this issue to Mr. Solderich, the Business Manager.[2]  (Id. ¶¶ 134-35.)
As Business Manager, Mr. Solderich's duties were managing business and insurance concerns,
budgeting, grant writing, overseeing donations, purchasing capital equipment, long-term
planning, licensing, and payroll.  (Id. ¶¶ 104, 105.)   To address his concerns, Ogilvie contacted
the 401(k) company directly and learned that NOVA had not deposited its 401(k) contributions
for the third and fourth quarter.  (Id. ¶ 136.)  Ogilvie sent an e-mail to the NOVA Board of
Trustees and H.R. Committee on January 10, 2005, complaining about this matter.  (Id. ¶¶ 132,
142.)  The issue was resolved and the  money was distributed to employees by February 5, 2005.
(Def.'s Mot. Summ. J. 22.)

    C.    <u>Sexual Advances</u>

      On January 10, 2005, after Ogilvie had sent the e-mail about the 401(k) issues, he alleges
that Solderich sexually harassed him.  Ogilvie contends he received a phone call from Solderich
asking Ogilvie to meet him at his home later that evening.  Ogilvie alleges that Solderich said the
drive would be worth his time, they could talk company shop, and could share alcoholic
beverages; further, Ogilvie alleges Solderich said he required Ogilvie's cooperation while he
handled the 401(k) matter and Ogilvie could spend the night in Solderich's room.  (Id. ¶¶ 143-
45.)  Ogilvie also alleges that Solderich stated that when he was intoxicated he had "the tendency
to engage in affection from members of the same sex and offered the Plaintiff the opportunity to
have sex with him . . . ."  (Compl. ¶ 16.)

---

[2]Mr. Solderich was not employed by NOVA directly until March 2005, after Ogilvie's
termination.  Instead, he was employed by Northampton Regional EMS but had an agreement to
assist NOVA's management as Business Manager beginning in March 2004.  (Def.'s Statement
Undisputed Material Fact ¶¶ 100-02.)

The next incident of alleged sexual harassment occurred on January 12, 2005, when Ogilvie was asked to write an incident report about the staging incident.  Ogilvie contends Solderich said he was sorry it had come to this and Ogilvie had given up the opportunity to see him at his residence.  (Def.'s Statement Undisputed Material Facts ¶ 146.)

The final incident was on January 19, 2005, before NOVA appealed Ogilvie's unemployment compensation.  Ogilvie alleges Solderich indicated that his bedroom door opportunity was still available before hardships continued and that he was sorry it had come to this.  (Id. ¶ 148.)  Ogilvie also claims Solderich had sometimes inappropriately touched his face stating that he needed to shave and had asked to be invited to his hot tub.  (Dep. Bruse Ogilvie 323-35.)  Ogilvie alleges that two other male employees had told him that they had had consensual sexual relations with Solderich.  (Id. 312-13.)  Ogilvie never reported these incidents to the H.R. Committee or anyone else within NOVA except Regan, including during his termination process (Def.'s Statement Undisputed Material Facts ¶¶ 152, 154.)  NOVA had a sexual harassment policy in place, of which all employees were informed.  (Def.'s Answer ¶ 73.)  Solderich denies that any of the alleged incidents occurred and denies being homosexual.  (Dep. Joseph Solderich 26.)

D.     Plaintiff's Termination

NOVA's H.R. chair, Ms. Abruzzi, learned of the staging incident on January 9 or January 10, 2005, from several employees, including Mr. Alexa, the NOVA chief, and Solderich.  (Dep. Wendy Abruzzi 12.)  She then called a meeting to review the incident.  (Def.'s Statement Undisputed Material Facts ¶ 73.)  Ogilvie and Regan were suspended pending review of the

incident, although there is a dispute about the exact effective date.[3]  The Committee

recommended terminating Ogilvie and Regan by majority vote.  (Id. ¶¶ 73, 94.)

  Solderich was an ex-officio but non-voting member of the Committee.  He lacked

authority to fire Plaintiff.  (Id. ¶ 108.)  Solderich was not Ogilvie's direct supervisor but did field

questions and concerns from the line supervisors, who supervised day-to-day activities.  (Id. ¶¶

106, 109.)  Ogilvie and Solderich worked different shifts.  (Id. ¶ 107.)  During the investigation

of the staging incident, Solderich was asked by the H.R. Committee to gather the facts, which he

did by soliciting employee statements and creating a timeline detailing the incident.  (Id. ¶¶ 111-

12.)

  Ms. Abruzzi stated that Ogilvie was terminated because of his "basic, critical, negligent

reaction" to the staging order on January 8, which she considered a "severe infraction" and "poor

professional judgment."  (Dep. Wendy Abruzzi 21-23.)  Ogilvie contends that the Committee

was motivated to fire him because Solderich escalated the staging incident to Committee

members and made "mountains out of mole hills."  Ogilvie also contends Alexa was biased

against him.  (Def.'s Statement of Undisputed Material Facts ¶¶ 169-70.)  Independent of the

Committee's decision, the NOVA medical director rescinded Ogilvie's medical command

authorization because of the staging incident on January 17, 2005; without this authorization

Ogilvie was unable to work as a paramedic.  (Id. ¶¶ 117, 122-23.)

---

[3]Plaintiff states that he was suspended on January 12, after Mr. Solderich's first alleged
proposition.  (Dep. Bruse Ogilvie 228, Compl. ¶ 18.)  Defendant contends Plaintiff was
suspended on January 10, prior to the alleged conversation with Mr. Solderich.  (Def.'s Answer ¶
18, Def.'s Reply Br. Supp. Mot. Summ. J. 10.)

II.     **Procedural History**

Plaintiff commenced this case by a Writ of Summons on November 22, 2006, and filed a

Complaint on January 12, 2007, in the Court of Common Pleas, Lehigh County, Pennsylvania.

The case was removed to this Court on February 5, 2007.  Following discovery, Defendant filed

its Motion for Summary Judgment on May 23, 2008.  Defendant also filed a Motion to Compel

Plaintiff's military records during discovery, which the Court granted on March 6, 2008.  On

October 17, 2008, the Court held oral argument on the Motion for Summary Judgment.

III.    **Parties' Contentions**

In his Complaint, Plaintiff raised three Counts: (1) gender discrimination under Title VII

(2) retaliation under Title VII and (3) a violation of the Pennsylvania Human Relations Act.

Plaintiff's Complaint also makes reference to "quid pro quo."  (Compl. ¶ 17.)

In its Motion for Summary Judgment, Defendant contends that each of the Plaintiff's

claims should be dismissed as a matter of law.  Defendant argues that Plaintiff has failed to state

a prima facie case of disparate treatment under Title VII and the PHRA because, although he can

claim to be a member of the protected class of males, he has not demonstrated that he was treated

differently than similarly-situated employees.  Defendant argues that Plaintiff can not establish a

claim for quid pro quo sexual harassment because Solderich was not his supervisor and because

Plaintiff's  rejection of the alleged advances did not play a role in his termination due to

Defendant's legitimate non-discriminatory reason for firing him.  Finally, Defendant argues that

Plaintiff has failed to make a prima facie claim for retaliation based on either his 401(k)

complaints or the alleged sexual advances.  Plaintiff's 401(k) complaints do not constitute a Title

VII protected activity.  Plaintiff's refusal of sexual advances is a protected activity, but Plaintiff

has failed to show the causal connection between the advances and his termination.  Further, Defendant argues there was a legitimate, non-discriminatory reason for his firing.

    In response, Plaintiff states that direct evidence is not required in gender discrimination cases under a mixed motives theory.  In addition, he asserts that same-sex harassment is actionable.  Plaintiff argues that he has demonstrated sufficient evidence of a hostile work environment harassment claim.  To support his retaliation claim, Plaintiff asserts that the temporal proximity of Solderich's alleged advances to his termination and the increased disciplinary scrutiny he received establish the necessary causal connection between the protected activity and his termination.  Finally, Plaintiff asserts that Solderich was a supervisor, and therefore NOVA is directly liable for his alleged harassment.  In addition, Plaintiff argues that there is a factual issue of whether Defendant can assert the Faragher/Ellerth defense.

    Defendant's reply summarizes its previous arguments and responds to new issues raised by the Plaintiff.  Defendant argues that if Plaintiff is pursuing a mixed motives discrimination theory, his remedies are limited to declaratory and injunctive relief and attorney fees where Defendant can show it would have taken the same action absent an impermissible factor.  However, Defendant argues that no impermissible factor exists here since sexual orientation is not a protected class, Plaintiff has failed to establish a gender stereotyping claim, and Plaintiff was not treated differently than other employees.  Defendant argues that Plaintiff's Complaint does not allege or support a hostile work environment claim, so this claim is not valid.  In the alternative, Defendant argues that Plaintiff's hostile work environment claim fails because he has not shown severe and pervasive conduct; Defendant had a legitimate, non-discriminatory reason for his firing; and Plaintiff has not shown pretext.  Defendant further argues that since Plaintiff's

brief is non-responsive as to the quid pro quo claim, it is entitled to summary judgment on this issue.  As to the retaliation claim, Defendant argues that Plaintiff's claim lacks temporal proximity since the alleged harassment happened after the termination process began; the alleged antagonism stemmed from job performance disagreements, not a protected activity; and those responsible for Plaintiff's firing were unaware of the protected activity.  Finally, Defendant argues that Mr. Solderich was not a supervisor, and therefore NOVA is not liable for his actions, or in the alternative, NOVA is entitled to the <u>Faragher/Ellerth</u> defense.

## IV.    Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  <u>Fed. R. Civ. P.</u> 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  <u>Id.</u> _____

_____A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  <u>Id.</u> at 325.  After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue

for trial." Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails

to rebut by making a factual showing "sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477

U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the

light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

**V.      Discussion**

       A.      Sexual Harassment[4]

As a preliminary matter, the Court must determine if Mr. Ogilvie's claim is within the

purview of Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer

"to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1).   However Title VII does not prohibit discrimination based

on sexual orientation.  Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 261 (2001).

The Supreme Court has held that Title VII provides a cause of action for same-sex sexual

harassment where the victim can "prove that the conduct at issue was not merely tinged with

offensive sexual connotations, but actually constituted 'discriminat[ion] . . . because of . . . sex.'"

---

[4]Plaintiff's Complaint Count I alleged gender discrimination under Title VII generally.
Defendant's Motion for Summary Judgment addressed a disparate treatment claim by applying
the McDonnell Douglas burden-shifting framework.  See McDonnell Douglas Corp. v. Green,
411 U.S. 792, 802-04 (1973).  However, in his Response Brief, Plaintiff did not pursue a
disparate treatment claim besides stating the "mixed motives" standard announced in Desert
Palace, Inc. v. Costa, 539 U.S. 90 (2003).  At oral argument, Plaintiff conceded that he was
relying on a hostile work environment claim as his Title VII discrimination claim.  Therefore, the
Court will not address disparate treatment and instead will assess Plaintiff's sexual harassment
claim.

-10-

Oncale v. Sundowner Offshore Serv., 523 U.S. 75, 81 (1998).  Therefore, regardless of the

plaintiff's sexual orientation in a harassment claim, "[the] plaintiff is required to demonstrate that

the harassment was directed at him or her because of his or her sex."  Bibby, 260 F.3d at 265.

The Third Circuit has enumerated at least three situations where same-sex harassment

constitutes discrimination because of sex: (1) the harasser was motivated by sexual desire, (2) the

harasser was expressing a general hostility to the presence of a particular sex in the workplace, or

(3) the harasser was acting to punish the victim's noncompliance with gender stereotypes.

Bibby, 260 F.3d at 264.  With regards to a sexual desire claim, the Third Circuit stated in dicta

that "when a gay or lesbian supervisor treats a same-sex subordinate in a way that is sexually

charged, it is reasonable to infer that the harasser acts as he or she does because of the victim's

sex."  Bibby, 260 F.3d at 262.

Although his Response Brief cites to numerous same-sex gender stereotyping cases,

Plaintiff acknowledged at oral argument that the facts in this case support a sexual desire claim

as described in Bibby.  Ogilvie argues that Solderich's three alleged advances to Ogilvie plus

statements by two other male NOVA employees to Ogilvie that they had had consensual sexual

relations with Solderich establish that Solderich desired Ogilvie.  However, Ogilvie failed to

establish admissible evidence on the record that Solderich had sexual relations with the other

male employees.  Instead Ogilvie relies on his own deposition testimony regarding conversations

he had with the two male employees, but the Court can not consider this because it constitutes

hearsay.  See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999) ("[A]

hearsay statement that is not capable of being admissible at trial should not be considered on a

summary judgment motion").

Considering Ogilvie's deposition testimony about Solderich's advances towards him alone and taking the facts in the light most favorable to the non-moving party, Ogilvie has raised sufficient questions of fact that Solderich was motivated by sexual desire.  Therefore, Ogilvie has presented a viable claim of gender discrimination.  See Warmkessel v. E. Penn Mfg. Co., 2005 WL 1869458, at *4 (E.D. Pa. 2005) (denying summary judgment because disputes of material fact existed about the alleged harasser's sexual preference); but see Collins v. TRL, 263 F.Supp.2d 913, 919-20 (M.D. Pa. 2003) (granting summary judgment on the plaintiff's harassment claim where the plaintiff failed to demonstrate that the alleged harasser was homosexual or motivated by a desire to have sex with the plaintiff).

However, this analysis does not end the inquiry.  Although Plaintiff's claim falls within the scope of Title VII, to have a valid claim Plaintiff must establish at least one of the two types of sexual harassment: hostile work environment or quid pro quo.  See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65-66 (1986) (describing the two types of sexual harassment claims).

### 1.    Hostile Work Environment

Hostile work environment harassment exists when unwelcome sexual misconduct has the purpose or effect of unreasonably interfering with a persons's work performance or creating an intimidating, hostile, or offensive working environment.  Meritor, 477 U.S. at 65.  In order to establish a claim for sexual harassment based on a hostile work environment, the plaintiff must show that (1) the employee suffered intentional discrimination because of his or her sex (2) the discrimination was severe or pervasive (3) the discrimination detrimentally affected the plaintiff (4) the discrimination would detrimentally affect a reasonable person in like circumstances and

(5) the basis for employer liability is present.[5]  Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also Kay v. Independence Blue Cross, 142 Fed. Appx. 48, 50 (3d Cir. 2005) (applying this five-prong test to a same-sex sexual harassment claim).

As to the first prong, sexual propositions are recognized as intentional discrimination based on sex.  See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990).  However, Plaintiff's claim fails to show severe or pervasive conduct under the second prong of the test.  To determine whether an environment is hostile or abusive, courts must look to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  Incidents of harassment must occur "either in concert or with regularity" to be actionable.  Andrews, 895 F.2d at 1484 (internal quotations omitted).

Isolated propositions without more have not been found to be severe or pervasive.  See Shramban v. Aetna, 115 Fed. Appx. 578, 580 (3d Cir. 2004) ("Simple teasing, offhand

_____

[5]The Third Circuit first adopted this five-prong test in Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).  However the second prong of the Andrews test stated that discrimination must be "pervasive and regular," while the Supreme Court used a "severe or pervasive" standard.  Id.; Pa. State Police v. Suders, 542 U.S. 129, 133 (2004) (citations omitted).  In Jensen v. Potter, the Third Circuit explicitly adopted the Supreme Court's standard, noting "[t]he difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here."  435 F.3d 444, 449 n.3.  Although prior Third Circuit cases usually applied the "pervasive and regular" standard, those cases are still instructive since the same type of analysis applies under either standard.

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."); Swanson v. Nw. Human Serv., Inc., 2006 WL 3354145, at *3 (E.D. Pa. 2006) (not finding pervasive and regular conduct or sufficient severity where plaintiff alleged that defendant told him he looked good in his jeans once, grabbed his buttocks once, and asked him on dates over a two-month period); Saudi-Kamara v. Parkway Corp., 155 F.Supp.2d 436, 439-40 (E.D. Pa. 2001) (not finding severe or pervasive conduct where plaintiff's supervisor patted her buttocks and breast and propositioned her multiple times).

Ogilvie alleges three instances where Solderich made suggestive comments or appeared to proposition him.  Applying the factors stated in Faragher, these allegations do not constitute a hostile work environment.  Although the incidents occurred within a short period of time–nine days–they were not pervasive during the course of Ogilvie's six-year employment; in fact they occurred during the process of Ogilvie's termination and after the incident that Defendant alleges caused Ogilvie's firing.  Further, Solderich's advances were not severe; they constituted mere utterances, and they were not vulgar or sexually explicit.  Ogilvie's allegations are even milder than those at issue in Swanson or Saudi-Kamara, where the Court did not find severe or pervasive conduct.  Ogilvie does not allege any physical contact accompanying the propositions. Ogilvie alleged that Solderich had touched his face prior to the advances but admitted this was not sexual in nature.  (Dep. Bruse Ogilvie 324.)  Finally, Solderich's comments did not interfere with Ogilvie's work performance.

Because Plaintiff has failed to show severe or pervasive conduct necessary to establish a

hostile work environment claim, this Court will not analyze the remaining prongs.[6]  However, the fifth prong–the existence of employer liability–is addressed below.  The Court will grant summary judgment with respect to the hostile work environment claim.

>    2.    *Quid Pro Quo*

A quid pro quo claim arises when "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998).  In order to prove quid pro quo sexual harassment, a plaintiff must show that "'his or her response to unwelcome advances was subsequently used as a basis for a decision about compensation, [terms, conditions, or privileges of employment].'"  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281-82 (3d Cir. 2000) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997)).  The plaintiff's burden in a quid pro quo sexual harassment claim and a retaliation claim are similar.  Farrell, 206 F.3d at 283.  Thus, in order to show that certain conduct was "used as a basis" for employment decisions, a plaintiff may rely upon a broad array of evidence to do so.  Id. at 283-84.  To establish causation, the plaintiff may point to evidence of hostility or repeated demands for sexual favors, evidence that the employer gave inconsistent reasons for termination, and evidence of close timing between plaintiff's response and

––––––––––––––––––––

    [6]The Court notes that it is not applying a McDonnell Douglas burden-shifting framework to the Plaintiff's hostile work environment claim.  411 U.S. at 802-04 (describing the burden-shifting analysis).  Although courts are divided over whether McDonnell Douglas applies to hostile work environment claims, see Brillhart v. Sharp, 2008 WL 2857713, at *10-11 (M.D. Pa. 2008), the Third Circuit has strongly suggested that the Andrews test by itself is sufficient to establish a hostile work environment claim.  Abramson v. William Patterson Coll., 260 F.3d 265, 281 n.11 (2001); see also Brillhart, 2008 WL 2857713, at *11 ("where sexually explicit harassment is to be considered its own proof of intent to discriminate, the McDonnell Douglas framework does not apply").

termination.  Pergine v. Penmark Management Co., Inc., 314 F.Supp.2d 486, 492 (E.D. Pa. 2004)

(citing Farrell, 206 F.3d at 282-85).

Ogilvie's strongest evidence of causation is the temporal link between Solderich's

advances and his termination.  Nevertheless, the staging incident for which Ogilvie was

subsequently placed under investigation, suspended, and terminated happened before any of

Solderich's advances.  Ogilvie contends that the was not actually suspended until January 12,

2005, after the first advance by Solderich on January 10.  However, the H.R. Committee Chair

Abruzzi stated that she became aware of the staging incident on January 9 or January 10 and then

called for an H.R. meeting to review the incident, so the suspension process likely commenced

prior to the alleged advance.  The remaining two propositions by Solderich occurred after the

Committee began termination proceedings and therefore are unlikely to have been used as a basis

for his termination.  Although Ogilvie asserts three sexual propositions by Solderich, he does not

present any evidence of hostility or threats of job loss if he rejected the advances.  Further,

NOVA and Mr. Solderich have been completely consistent in stating that the reason Ogilvie was

fired was because of the staging incident.  (Dep. Joseph Solderich 29.)

Assuming, arguendo, that Plaintiff has advanced a prima facie claim of quid pro quo

harassment, NOVA had a legitimate, non-discriminatory reason for firing Plaintiff based on the

staging incident.  Under the burden-shifting framework of McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802-04 (1973), once the plaintiff has made a prima facie case of discrimination,

the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the

employee's dismissal.  See also, Schepis v. Raylon Corp., 2006 WL 2803050, at *2  (E.D. Pa.

2006) (applying the McDonnell Douglas burden-shifting framework to a quid pro quo claim);

Farrell, 206 F.3d at 268 n.11 (declining to address whether the burden-shifting framework applied to quid pro quo claims and accepting the District Court's application of a burden-shifting analysis); Craig v. Y & Y Snacks, Inc., 721 F.2d 77, 79 (1983) (applying the McDonnell Douglas burden-shifting framework to a quid pro quo claim).

Defendant has consistently stated that Ogilvie was fired because of his failure to respond to  the staging dispatch of January 8, 2005, and his failure to notify the 911 Center of his decision not to stage.  NOVA H.R. Chair Abruzzi described this incident as a "severe infraction," which caused a delay in responding to an emergency dispatch.  (Dep. Wendy Abruzzi 16; Def.'s Statement Undisputed Material Fact ¶ 32.)  The H.R. Committee gathered employee statements and documentation about the incident, allowed Ogilvie to make his own statement, and ultimately decided to terminate him.  In addition, at the time, Ogilvie was on the third level of the progressive discipline policy and was on a three-month probationary period.  (Def.'s Statement Undisputed Material Fact ¶¶ 61, 63-64.)  Finally, NOVA's medical director revoked Plaintiff's medical command authorization because of the incident, rendering him ineligible to work as a paramedic.  All of these facts establish Defendant's legitimate, nondiscriminatory reason for firing.

Under McDonnell Douglas, the burden then shifts back to the plaintiff to show that the defendant's proffered reason for firing was pretextual.  411 U.S. at 804.  The plaintiff can show pretext by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

-17-

As to the first prong of the <u>Fuentes</u> test, to discredit the employer's articulated reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the issue is whether discriminatory animus motivated the employer.  <u>Fuentes</u>, 32 F.3d at 765.  Instead, the nonmoving party must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder would find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.  <u>Id.</u>  Plaintiff's subjective belief that the employer's decision to terminate him was wrong is not adequate evidence that a defendant's proffered reason was pretextual.  <u>Billet v. CIGNA Corp.</u>, 940 F.2d 812, 825 (3d Cir. 1991); <u>Andy v. United Parcel Serv.</u>, 2003 WL 22697194, at *2 (E.D. Pa. 2003).

Ogilvie contends that the staging incident was a minor infraction used as an excuse to terminate him and that NOVA had created a paper trail against him of additional minor infractions.  However, this argument is not an adequate substitute of evidence of pretext.  Most harmful to the Ogilvie's claim of pretext is that Regan, the other employee involved, was also fired over the staging incident, and Regan has not alleged any sexual advances or discrimination. Defendant has presented credible evidence that Ogilvie and Regan committed a serious infraction that led to their firing. The infraction rendered Ogilvie independently ineligible to continue as a NOVA paramedic due to the revocation of his medical command authorization.  Further, Ogilvie had been the subject of multiple prior disciplinary actions.  All of these infractions occurred prior to the alleged harassment, so they can not be considered as additional support for his quid pro quo claim.  Ogilvie has failed to demonstrate any weaknesses or inconsistencies in NOVA's legitimate reason for firing him, and there is no basis on which a reasonable factfinder could infer

pretext or intentional discrimination.

As to the second prong of the <u>Fuentes</u> test–establishing that a discriminatory reason was more likely than not a motivating or determinative cause of his firing–Ogilvie has failed to carry his burden of persuasion that discrimination played a role in his firing.  As noted above, NOVA terminated Regan over the exact same incident, and Regan has not alleged discrimination. Additionally, Ogilvie has failed to establish that Solderich played a significant role in his termination or that any voting member of the H.R. Committee knew of Solderich's alleged advances or Ogilvie's refusal of these advances.  Ogilvie has not alleged any other discriminatory acts by NOVA beyond Solderich's alleged advances.  Taking the evidence as a whole, it can not be inferred that the alleged discriminatory act by Solderich played any role in Ogilvie's termination.

Based on the above analysis, this Court will grant summary judgment on the Plaintiff's quid pro quo sexual harassment claim.

### 3. *Employer's Liability*

Plaintiff's sexual harassment claims fail for an additional reason–Plaintiff has failed to establish that Solderich was his supervisor and that NOVA is therefore liable for his alleged actions.  As stated by the two landmark decisions of the Supreme Court on this issue, an employer is strictly liable for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee, although the employer may have an affirmative defense if there was no tangible employment action.  <u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807; <u>Cole v. Fed. Express</u>, 2008 WL 4307090, at *4 (2008).  Employer liability in quid pro quo claims also depends on whether the alleged harasser is a supervisor.  <u>See</u>

Ellerth, 524 U.S. at 765 ("the labels quid pro quo and hostile work environment are not

controlling for purposes of establishing employer liability"); Bonenberger v. Plymouth Twp., 132

F.3d 20, 28 (3d Cir. 1997) ("Title VII quid quo pro sexual harassment generally requires that the

harasser have authority to carry out the quid pro quo offer or threat."); Sicalides v. Pathmark

Stores, Inc., 2000 WL 760439, at *9 (E.D. Pa. 2000) (finding that the plaintiff's quid pro quo

claim lacked merit because the alleged harasser was not plaintiff's supervisor).  However, neither

the Supreme Court nor the Third Circuit has delineated a precise test to determine whether an

employee has sufficient authority to be deemed a supervisor.  Sofia v. McWilliams, 2003 WL

1818414,  at *7 (E.D. Pa. 2003).

The Third Circuit has held that a supervisor need not have complete authority to act on

his employer's behalf in order to impute Title VII liability on the employer.  Durham Life Ins.

Co. v. Evans, 166 F.3d 139, 154-55 (1999) (finding supervisory authority where the alleged

harasser was part of a three-person team two levels above the plaintiff that pressured plaintiff's

supervisor to remove plaintiff from office and instigate a lawsuit against her).  EEOC Guidelines

state "[a]n individual qualifies as an employee's supervisor if: a. the individual has authority to

undertake or recommend tangible employment decisions affecting the employee; or b. the

individual has authority to direct the employee's daily work activities."  EEOC Enforcement

Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, available at

http://www.eeoc.gov/policy/docs/harassment.html (last updated June 21, 1999).

In this Court, Judge Yohn held that there was a genuine issue of material fact as to

supervisor status where the alleged harasser, the meat department manager, was not the

plaintiff's manager in the marketing department where she worked, but he could regularly order

the plaintiff to work in his department and perform tasks under his direction; he had influence as

a manager to cause her firing; and he could submit comments on her evaluations for merit raises.

Sofia, 2003 WL 1818414, at *8.  However, Judge Kelly granted summary judgment where

statements by two co-workers that the harasser was their "boss" and the harasser's assertion that

he was "in charge" when the deli manager was not on duty constituted the plaintiff's only

evidence that her alleged harasser, a fellow deli clerk, was her supervisor.  Sicalides, 2000 WL

760439, at *7.

Plaintiff has not presented sufficient evidence to demonstrate that Solderich was his

supervisor.  Solderich's Business Manager duties were primarily administrative.   Although,

Solderich had some indirect supervisory authority, since he could be contacted by the line

supervisors–who oversaw day-to-day operations–with questions or problems, he did not regularly

direct Ogilvie's daily work activities.   Unlike in Sofia, Solderich did not have much daily contact

with Ogilvie, since they worked different shifts, and Ogilvie did not perform under Solderich's

direction.  Instead, Ogilvie admits that Mr. Alexa, the chief of NOVA, was his immediate

supervisor.  (Pl.'s Resp. Br. Def.'s Mot. Summ. J. 1.)  As in Sicilades, Ogilvie relies on his own

bare assertions that Solderich was the "EMS Manager" and "top manager," without providing

any supporting evidence.  (Def.'s Mem. Opp'n Mot. Summ. J. 34.)  Although there are a number

of inconsistencies in Ogilvie's reliance on the facts and his contentions, and between his briefs

and oral argument, these are not grounds on which to grant summary judgment.

In addition, this case is distinguishable from Sofia because Solderich did not have

authority to terminate Ogilvie or make other personnel decisions.  Solderich attended H.R.

Committee meetings but could not vote.  He was not interviewed during the termination process,

he did not call for the meeting to terminate Ogilvie, nor did he speak at this meeting.  His role in

Ogilvie's termination was limited to being one of several staff members who reported the staging

incident to the H.R. chair and gathered some facts related to the incident in advance of the

meeting.  Based on these facts, Plaintiff has not produced sufficient evidence that Solderich was

his supervisor within the meaning of Title VII.[7]

B.      Retaliation

Title VII bars retaliation against employees who opposed any practice barred by Title VII.

42 U.S.C. § 2000e-3(a).  Courts apply the McDonnell Douglas burden-shifting analysis to

retaliation claims.  Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).  Under the

first step of the analysis, Plaintiff must show a prima facie case of retaliation.  Id.  The elements

of a retaliation claim are (1) the employee engaged in a protected activity, (2) the employer took

an adverse employment action after or contemporaneous with the employee's protected activity,

and (3) a causal link exists between the employee's activity and the adverse action.  Farrell, 206

---

[7]Since Solderich was not his supervisor and because Plaintiff alleges a tangible employment action (his termination), the Court does not address the Faragher/Ellerth defense. Under this defense, a defendant can escape liability for a supervisor's alleged harassment that does not end in a tangible employment action if it can show (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Ellerth, 542 U.S. at 765; Faragher, 524 U.S. at 807.

If Solderich was in fact Plaintiff's supervisor and no tangible employment action had occurred, the Court notes that this defense would be available to Defendant.  First, NOVA had a sexual harassment policy of which Ogilvie was aware.  (Def.'s Answer ¶ 63, 73.)  Second, during his termination and appeal hearing, Ogilvie never informed NOVA authorities of Solderich's alleged advances or made any mention of sexual harassment.  Ogilvie argued that there was no one at NOVA to whom he could complain, since Solderich was a manager.  However, Ogilvie could have reported his allegations to the H.R. Committee, the H.R. Chair, the Board of Directors, or the NOVA Chief, and Ogilvie offers no explanation for failing to do so.

F.3d at 279.

_____    1.    *401(k) Complaints*

Plaintiff's Complaint appears to allege and Defendant's Motion addresses the allegation that Plaintiff was terminated as retaliation for his inquiry into the company's missing 401(k) statements and money.  However this claim fails as a matter of law.  Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII.  Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134 (3d Cir. 2006) (affirming dismissal of two counts of retaliation for failure to engage in a protected activity).  Complaints about retirement funds do not constitute a Title VII protected activity, so Plaintiff fails to state a retaliation claim with regards to his 401(k) complaints.

_____    2.    *Sexual Advances*

On the other hand, Plaintiff's allegation that he was terminated because of his rejection of Solderich's sexual advances does constitute a protected activity under Title VII.  See Farrell, 206 F.3d at 279 n.4 ("[T]he District Court held that the rejection of a sexual advance was a protected activity, . . . and that determination has not been questioned on appeal.  Therefore we do not need to address it.").  In addition, Plaintiff's termination constitutes an adverse employment action contemporaneous with the protected activity.[8]  Id.  As to the third element of retaliation, Plaintiff

_____

[8]Ogilvie contended at oral argument that the adverse employment action taken in retaliation may also have been Defendant's appeal of his request for unemployment benefits.  This argument was not briefed, and there are insufficient facts on the record to evaluate the circumstances surrounding the appeal.  However, a retaliation claim based on the unemployment appeal fails for the same reason that a claim based on Ogilvie's termination fails.

Assuming, arguendo, a prima facie claim, Ogilvie has failed to show pretext.  NOVA

must establish a causal link between his rejection of the advances and his termination.

To create an inference of a causal link, the Third Circuit has relied on "temporal proximity between the protected activity and the alleged retaliatory act," and it is more likely to make this inference when evaluating a prima facie case at the summary judgment stage.  Farrell, 206 F.3d at 279-80 (citing Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir.1989)).  However, "temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive,' . . . ."  Farrell, 206 F.3d at 280 (citing Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).  In addition, the Third Circuit has considered factors such as the employer's "pattern of antagonism" or retaliatory animus, an employer's inconsistent reasons for the employment action, inconsistencies in the defendant's testimony, the defendant's conduct toward others, and the record as a whole.  See Farrell, 206 F.3d at 280-81.

As described above in the analysis of Plaintiff's quid pro quo harassment claim, Plaintiff has failed to establish sufficient causation between the sexual advances and his termination.  Ogilvie relies heavily, if not exclusively, on the temporal proximity of the two events.  However, two of the three alleged propositions occurred after Ogilvie was suspended from his duties because of the staging incident, and the other proposition occurred after the H.R. Chair was aware of the incident and was planning to hold a meeting about it.  The timing leads to a single

_____

appealed Regan's request for unemployment just as it appealed Ogilvie's claim.  (Def.'s Statement Undisputed Fact ¶ 179.)  NOVA stated that it appealed Ogilvie's application because he materially misrepresented the grounds for his firing as his 401(k) complaints; NOVA responded that Ogilvie was terminated because of the staging incident, consistent with their previous actions and statements.  (Def.'s Answer ¶ 63, 73.)  Plaintiff has failed to establish any evidence of pretext behind NOVA's appeal.

conclusion: that it was the staging incident, and not Solderich's propositions that led to Ogilvie's termination; therefore, timing on its own does not create an inference of a causal link absent other suggestive facts.

Ogilvie also relies on a "pattern of antagonism" and intense scrutiny, which allegedly caused him to be written up for minor errors based on subjective, arbitrary standards. However, his prior disciplinary actions occurred well before Solderich's alleged advances, so they can not be suggestive of retaliation for a Title VII protected activity.

Finally, the employer's actions do not suggest retaliation. NOVA has consistently stated that Ogilvie was fired because of the staging incident, and NOVA fired Regan, Ogilvie's working partner, who was also involved. Ogilvie has not demonstrated that those responsible for his firing–the H.R. Committee–were aware of Solderich's advances or his rejection of them. In fact, Ogilvie admits that he did not inform any authorities of the alleged sexual harassment. Although other circuits require that the employer must have "actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation." Buettner v. Arch Coal Sales Co., 216 F.3d 707, 715 (8th Cir. 2000); see also Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001), and the Third Circuit does not require actual knowledge, it may be a persuasive consideration. See Embrico v. U.S. Steel Corp., 404 F.Supp.2d 802, 838 (E.D. Pa. 2005) (finding an insufficient causal link for a prima facie case where the plaintiff did not establish that those responsible for the adverse employment action had knowledge of his protected activity). Based on the above reasoning, Plaintiff has failed to state a prima facie claim of retaliation.

Assuming, arguendo, that Plaintiff has shown a prima facie claim of retaliation,

Plaintiff's claim fails under the McDonnell Douglas burden-shifting analysis.  As described above, Defendant had a legitimate, nondiscriminatory reason for firing him, and Plaintiff has failed to show that this reason was pretextual.  Therefore, this Court will grant summary judgment on the retaliation claim.

      D.      Pennsylvania Human Relations Act

      The analysis under Title VII and the PHRA are identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.  Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001) see also Tomasso v. Boeing Co., 445 F.3d 702, 704 (3d Cir. 2006) (appying the McDonnell Douglas framework to the plaintiff's PHRA claims).  Since Plaintiff has failed to show a genuine issue of material fact as to his Title VII claims, this Court will grant summary judgment as to Plaintiff's PHRA claim.

**VI.    Conclusion**

      For the reasons stated above, the Court grants summary judgment as to all of Mr. Ogilvie's claims.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRUSE OGILVIE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| NORTHERN VALLEY EMS, INC. | : | NO. 07-485 |
| | : | |
| Defendant. | : | |

**ORDER**

AND NOW, this        29th        day of October, 2008, upon careful review of the motion and briefings, it is hereby ORDERED that Defendant Northern Valley EMS, Inc.'s Motion for Summary Judgment (Doc. No. 30) is GRANTED.  The clerk shall close the case.

BY THE COURT:

/s Michael M. Baylson

_____

Michael M. Baylson, U.S.D.J.

A:\Memo & Order re MSJ.wpd